

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-10-00361-CR

CORY MAURICE LONG                                                   APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

------------

### FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In two points, Appellant Cory Maurice Long appeals his conviction of four counts of aggravated robbery with a deadly weapon. We affirm.

### II. Factual and Procedural Background

The State charged Long with four counts of aggravated robbery with a deadly weapon, alleging that he intentionally or knowingly, while in the course of

---

[1]*See* Tex. R. App. P. 47.4.

committing theft of property and with intent to obtain or maintain control of said property, threatened or placed Summer Thrush, Robert Evans, Jacob Davidson, and Taishona Carpenter in fear of imminent bodily injury or death and used or exhibited a deadly weapon (a firearm).

During trial, the four complainants testified that during a party at Evans and Davidson's apartment, Long and an accomplice stole property, including two computers, at gunpoint. Long testified that he sold Evans fake drugs and that Evans instructed him to hold the two computers as security for payment; Long then sold the computers for $500. The jury convicted Long of four counts of aggravated robbery and assessed his punishment at forty-five years for each count, and the trial court entered judgment on the verdict. This appeal followed.

### III. Sufficiency

In his first point, Long complains that the evidence is insufficient to support his conviction.

### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to

2

draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi*, 330 S.W.3d at 638.

**B. Evidence**

No one disputes the use of alcohol and Ecstasy "tabs" at the party at Evans and Davidson's apartment. Evans returned to the apartment around 2:30 a.m. on June 6, 2009, from a party where he had been drinking. Davidson,

Thrush, and Carpenter, along with several others, were there; some were drinking and some were taking Ecstasy.[2]

Around 4:00 a.m., two men who Carpenter, Thrush, Evans, and Davidson did not know and had never seen before showed up at the apartment—a black man with dreadlocks and gold teeth or a gold grill on his teeth, who was identified at trial as Long, and a white man with a shaved head. Davidson said that he let the two men into the apartment because he assumed they knew someone at the party.

The two men entered the apartment, went straight back to Evans's bedroom with Evans, and closed the door. Evans said that the men wanted to buy five Ecstasy pills if Evans had any extra that he could sell to them. Evans was going to sell the pills for $10 each. Evans sat down at his computer; when he turned around, Long pointed a gun in his face.

Long told Evans, who was terrified, to give him all of his money; Evans had $250, and he gave it to Long but said that he would not have if Long had not had a gun. Long also asked for the rest of Evans's pills, and he told his accomplice to grab Evans's $1,400 desktop iMac G5. The accomplice left the room with the computer and then came back inside and took Evans's laptop iMac.

---

[2]Thrush and Carpenter had gone to several parties together before going to Evans and Davidson's apartment, and Carpenter said that she was drunk when they got there. Thrush took a tab but did not drink any alcohol at the apartment. She said that she was not "too messed up" and still knew what was going on around her. Davidson testified that he did Ecstasy at the apartment that night.

Thrush went to Evans's room and tried to open the door. She knocked, and Long opened the door and "basically, like, told [her] to get in there and, like, threw [her] across the room and told [her] to be quiet." He was holding a gun. Carpenter stated,

> [Thrush] went in. The door shut. I walked in after her. And as soon as I came in the room, I saw him and the other person that was there, and they had a gun, and they told me to shut the door. So immediately—I've never even seen a gun before. So I shut the door behind me.

Carpenter said that Long was holding the gun and that she thought she was going to die. Thrush said that Long started rounding up everything—money, a computer, and drugs—and that she was "absolutely terrified" and in fear for her life.

Davidson said that he saw the white man walk out with Evans's laptop and that was when he wondered what was going on. Then Long came out with a gun in his hand and told everyone to go into the room. Davidson said that he was scared when he saw the gun and that he thought he was in imminent danger of bodily injury or death. He, Carpenter, and the other party guests went into the room as instructed. Long told them to sit down, be quiet, take out their wallets, and take off their pants and throw them to him so he could check everything while the accomplice went through the apartment.

Long left the bedroom and used his cell phone to call someone "to bring the car around." When Long left the bedroom, Thrush tried to shut the door. Long came back in, shoved her to the ground, and told all of them not to do

5

anything stupid like that again. The robbers took an X-box 360, which belonged to Davidson, from the living room. They also took Evans's Wii game console, the cable box for the television, and anything else they could carry. Davidson said that if the men had not had a gun, they would not have let them take these items or Evans's laptop and computer.

After the robbery, one of the party guests chased after the men in his underwear, trying to get a license plate. Thrush, Carpenter, Davidson, and Evans stayed around to wait for the police and gave written statements. The police arrived around 5 a.m.

Evans punched two holes in his bedroom wall because he was very angry. He and Davidson talked about blaming the damage to the wall on the robbers because Davidson did not want to pay for it, but Evans said that he did not attribute the damage to the robbers in his written statement. Davidson acknowledged that he lied when he told the police that the robbers had punched two holes in the bedroom wall and that Evans had actually punched the holes because he was upset about the robbery. He told the police the robbers did it because he thought that if that was in the police report, he and Evans would not have to pay for it. Not long after the robbery, he and Evans terminated their lease and had to pay a penalty.

Evans said that he was "sobering down" during the robbery but that he was still intoxicated and that the only reason he gave the men his computer was because "they had a gun in [his] face." During cross-examination, Thrush

6

admitted that she had "a real bad memory sometimes" and again admitted that she had been drinking that night and taking Ecstasy. Carpenter said she was sober by the end of the night and completely sober "[b]y the time there was a gun in [her] face."

Evans testified that he subsequently received an e-mail from a computer store, asking him whether he was missing any computers. Evans replied to the store's email and went to the police with the store's information.

North Richland Hills Police Detective Enriqueta Garcia stated that she and Detective J.D. Smith, now retired, recovered Evans's two computers from Richland Computers. Robert Calvey, the store owner, and Justin Canada, a store employee, gave statements to her and provided documentation to her regarding the sale of the computers, including a copy of a cancelled check and a copy of the driver's license of the individual selling the computers—the driver's license belonged to Long.

The trial court admitted State's Exhibits 11 and 12. State's Exhibit 11 is the stipulation of Canada's testimony, which includes that on June 6, 2009, three men came into Calvey's store to sell a MacBook and an iMac desktop, and a white male, Ian Davis, claimed ownership and began filling out the paperwork. Davis did not have a driver's license, so Long produced his driver's license, from which a copy was made.

State's Exhibit 12 is the stipulation of Calvey's testimony: On June 6, three men came into his store to sell a MacBook and an iMac desktop computer for

$500. Ian Davis began filling out the sales form but could not produce valid identification, so Long gave his driver's license to Calvey. Calvey issued a check to Long for $500, which Long later cashed. Calvey later found Evans's contact information on the computer and e-mailed Evans. Evans contacted him about the property, and the computers were released to Detective Smith. Calvey provided copies of a check, Long's driver's license, and the sales forms to the police.

Detective Garcia assembled a photo lineup using the photo from Long's driver's license, and she showed the photo lineup to Thrush, Carpenter, Davidson, and Evans on June 16. Thrush, Carpenter, Davidson, and Evans all selected Long's photo from the array. Davidson said he was 100% positive about his identification. Evans said that he instantly recognized Long's face after spending thirty to forty-five minutes in the bedroom with Long on the night of the robbery. On June 16, Canada picked Long out of Detective Garcia's photo lineup. On June 17, Calvey viewed the same photo lineup and identified Long. The trial court admitted all of the photo lineups.

Detective Garcia said that as a result of her investigation, she secured an arrest warrant. She also testified that a handgun is a deadly weapon. On cross-examination, Detective Garcia agreed that if Evans had given the computers to Long, the computers would not be considered stolen.

Long testified that he had been convicted in Louisiana of the felony offense of possession of a controlled substance (cocaine) in September 2001 and of

aggravated battery in May 2005.[3]  In June 2009, he was employed driving Little Debbie trucks and sold Ecstasy pills on the side.  On June 6, K-Love, a white "dude," told him that somebody wanted to buy pills from him, and he and K-Love went to the apartment to sell fifty pills for $500.  Long explained the events of the evening, stating:

> The only person I ever talked to was the dude or the guy that said we went to his room.  I never talked to him on the phone.  It was understood that he was supposed to buy 50 pills, because the person that called me was a mutual friend of him [sic].  So that—I never really talked to him.

> So that's why when we come there, first we were outside, but he's like, Come inside.  That's when he was supposed to be getting the money for it.  When we get up in there, he say he don't have the money right now.  So I'm like, Did you make me come way from Dallas from this bull crap?  That's what I said.  He like, Hold on, then he asked me would I hold a computer until then.  He offered me a laptop first.  I'm like, That ain't enough to cover these pills.

> So he like—he got this whole computer that his momma just got for him.  Just hold it for lagniappe until he give me the money in the morning.  But honestly, the pills I had was fake anyway, so I'm looking at him like, I'm winning.

Long said that although Evans gave him the computers to hold, he sold them anyway.  Long also said that he did not have a gun, did not point a weapon at anybody, did not tell anyone to take off his or her pants, did not hit anybody in the

---

[3]During cross-examination, Long elaborated that he had been convicted of "possession with intent, two aggravated batteries, disarming a police officer."  He said that the police officer said that Long took his gun but that he was not guilty and that he ended up with a broken nose and injuries to his rib; the officer sustained a broken hand.  In 2001, he was convicted of attempted possession of a dangerous weapon (gun) while in possession of cocaine.  In 2003, he was convicted of attempted possession of cocaine.

head, did not throw a girl down, and did not rob anyone. Later that day, he and Ian Davis sold the computers for $500 at Richland Computers. Long cashed the $500 check.

During cross-examination, Long testified that he had never met Evans, Davidson, Thrush, or Carpenter before that night and that the apartment had been full of people. He said that they must have accused him of robbery because they discovered that the pills were fake. K-Love helped him carry out the stuff from the apartment. Long said that the State's witnesses lied about him having a gun and stealing anything. He said that Evans's friends were being loyal by testifying about the purported robbery.

## C. Analysis

Long argues that the evidence is insufficient because "the alleged eye witnesses were under the influence of alcohol or a controlled substance which would impair their ability to make a proper identification of the perpetrators." However, a witness's intoxication bears on his or her credibility, which is a matter reserved for the jury. *See Cain v. State*, 958 S.W.2d 404, 409 (Tex. Crim. App. 1997); *see also Gilmore v. State*, 822 S.W.2d 350, 351 (Tex. App.—Fort Worth 1992, no pet.) ("Johnson's state of intoxication on the date of the robbery certainly goes to the weight to be given to his testimony."). Further, Long admitted that he was present at the apartment that evening and that he left with Evans's computers, and he admitted to a history involving crime and violence. In light of the evidence set out above, we conclude that the jury could have found

beyond a reasonable doubt that Long intentionally or knowingly, while in the course of committing theft of property, threatened or placed Thrush, Evans, Davidson, and Carpenter in fear of imminent bodily injury or death while using or exhibiting a deadly weapon. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638; *see also* Tex. Penal Code Ann. §§ 29.02–.03 (West 2011) (defining the elements of robbery and aggravated robbery). We overrule Long's first point.

## IV. Hearsay

In his second point, Long complains that the trial court erred by overruling his hearsay objection during Davidson's testimony.

During Davidson's testimony, the following occurred:

Q. Who did you get the Ecstasy from?

A. [Evans] got it from one of his friends, and we were just getting it for the party.

> [Defense counsel]: Objection to hearsay.
>
> THE COURT: The question was: Who did you get it from?
>
> [Prosecutor]: Yes.
>
> THE COURT: Overruled.

A. The actual—I got it from [Evans].

Q. . . . Okay. So you got it from [Evans]. He's the one that had it?

A. Yes, sir.

11

No objection followed the second time the State asked who had the Ecstasy or had given it to Evans or Davidson's affirmative response that he obtained the Ecstasy from Evans.

To preserve error, a party must continue to object each time the objectionable evidence is offered. *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Martinez v. State*, 98 S.W.3d 189, 193 n.5 (Tex. Crim. App. 2003) (citing *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991)); *Fuentes v. State*, 991 S.W.2d 267, 273 (Tex. Crim. App.), *cert. denied*, 528 U.S. 1026 (1999). A trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998). This rule applies whether the other evidence was introduced by the defendant or the State. *Leday*, 983 S.W.2d at 718. Because the same evidence was admitted without objection immediately after Long's first objection, Long has failed to preserve error. *See* Tex. R. App. P. 33.1; *Geuder*, 115 S.W.3d at 13. Therefore, we overrule his second point.

## V.  Conclusion

Having overruled both of Long's points, we affirm the trial court's judgment.


PER CURIAM

PANEL:  MCCOY, GARDNER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  January 5, 2012